UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SECURITY BANK & TRUST COMPANY,                Case No. 21-CV-2572 (PJS/JFD)
Personal Representative of the Estate of
Kurt A. Amplatz,

                        Plaintiff,

v.                                                              ORDER

COOK GROUP, INC.; COOK INC.;
COOK MEDICAL TECHNOLOGIES
LLC; COOK MEDICAL LLC; and COOK
MEDICAL HOLDINGS LLC,

                        Defendants.

---

Edward F. Fox, Lewis A. Remele, Jr., Jeffrey R. Mulder, and Gillian L. Gilbert, BASSFORD REMELE, for plaintiff.

James R. Ferguson, Luiz Miranda, and Nicholas J. Ronaldson, MAYER BROWN LLP; Nathaniel J. Zylstra, FAEGRE DRINKER BIDDLE & REATH LLP, for defendants.

This matter is before the Court on defendants' motion to dismiss plaintiff's amended complaint. Defendants move under Fed. R. Civ. P. 12(b)(2) to dismiss Cook Group, Inc., Cook Medical Holdings LLC, and Cook Medical Technologies LLC for lack of personal jurisdiction. Defendants also move under Fed. R. Civ. P. 12(b)(6) to dismiss the entire amended complaint for failure to state a claim.

For the reasons that follow, the Court grants defendants' Rule 12(b)(2) motion and dismisses all of plaintiff's claims against Cook Group, Inc., Cook Medical Holdings

LLC, and Cook Medical Technologies LLC for lack of personal jurisdiction.  But the

Court denies defendants' Rule 12(b)(6) motion to dismiss the entire amended

complaint.[1]

## I.  BACKGROUND[2]

### A.  Procedural History

Plaintiff Security Bank & Trust Company ("Security") is the personal

representative of the estate of Kurt Amplatz.[3]  Am. Compl. ¶ 1.  Amplatz, who died in

November 2019, was a doctor and inventor who developed various medical

technologies.  Am. Compl. ¶ 9; Brumleve Dep. 36–37.  Security brings breach-of-

contract and related claims arising out of two royalty contracts, one executed in 1983

and the other in 1995.  Security alleges that defendants owe royalties to Amplatz's estate

---

[1]Defendants also object to Magistrate Judge John F. Docherty's order granting plaintiff leave to file an amended complaint that adds as defendants Cook Group, Inc., Cook Medical Holdings LLC, and Cook Medical Technologies LLC.  In light of the Court's decision to dismiss those defendants for lack of personal jurisdiction, defendants' objection to Judge Docherty's order is overruled as moot.

[2]Because this matter is before the Court on a motion made under both Rule 12(b)(2) and Rule 12(b)(6), the Court's summary of the background relies on both allegations in the amended complaint and evidence in the record.

[3]This action was originally commenced by James H. Gilbert as special administrator of the Amplatz estate.  ECF No. 1-1.  After Security was appointed as the personal representative of the estate, the parties agreed to substitute Security as the plaintiff.  ECF Nos. 22, 24.  To simplify the discussion, the Court will refer to Security as though it had originally commenced this action.

under those two agreements, but have refused to pay those royalties while continuing to use the Amplatz name.  In response, defendants contend that the two royalty contracts actually expired years before Amplatz's death.  In fact, Cook Inc. and Cook Medical LLC have counterclaimed against the estate, seeking a return of royalty payments that they claim were mistakenly made after the 1995 contract expired in 2000.  ECF No. 216 at 24–27.

In its original complaint, Security named five Cook entities as defendants: Cook Inc. ("Cook"); Cook Medical LLC ("CM"); Cook Group, Inc. ("Cook Group"); Cook Medical Holdings LLC ("CMH"); and Cook Medical Technologies LLC ("CMT").  ECF No. 1-1.  About five months after Security filed its original complaint, the parties stipulated to the dismissal without prejudice of Cook Group, CMH, and CMT.  ECF Nos. 29, 32.  In their stipulation, the parties agreed that defendants would "not object on relevance grounds to any reasonable discovery regarding the relationships between the Dismissed Cook Entities and the remaining Defendants," and further agreed that the remaining defendants would not object to any discovery request on the ground that the information sought was in the possession of the dismissed entities.  ECF No. 29 ¶¶ 4–5.  The parties then engaged in discovery.

On the last day of fact discovery, Security filed a motion to amend its complaint.  ECF No. 110 (scheduling order); ECF No. 166 (motion to amend).  Among other things,

Security sought to bring Cook Group, CMH, and CMT back into the case. Judge

Docherty granted that motion, and Security filed its amended complaint on May 11,

2023. ECF Nos. 218, 221.

### B. Defendants' Corporate Structure

Cook Group, which was founded in 1963, is an Indiana corporation with its

principal place of business in Indiana. Lehman Decl. ¶ 3. Cook Group owns companies

that are involved in several lines of business, including medical devices, life sciences,

and property management. Lehman Decl. ¶ 3.

Among Cook Group's holdings is CMH, a limited-liability company also

organized and located in Indiana. Lehman Decl. ¶¶ 8–9. CMH was formed in 2016 to

act as the holding company for Cook-related companies involved in the medical line of

business. Lehman Decl. ¶ 8; Whetham Dep. 237–38; Gilbert Decl. Ex. 27 [ECF No. 276-2

at 6].

CMH owns both Cook and CM, which are an Indiana corporation and an Indiana

limited-liability company (respectively), and which have their principal places of

business in Indiana. Lehman Decl. ¶¶ 10, 20. Cook manufactures medical products,

while CM acts as the exclusive distributor of Cook medical products in North America.

Lehman Decl. ¶ 21; Whetham Dep. 240–42.

Finally, CMT is an Indiana limited-liability company with its principal place of business in Indiana. Lehman Decl. ¶ 14. CMT was formed in 2010 to hold the intellectual-property rights of all of the Cook-related entities. Lehman Decl. ¶¶ 14, 16; Gilbert Decl. Ex. 27 [ECF No. 276-2 at 5]. Cook is the majority owner of CMT; the remainder of CMT is owned by other Cook entities. Lehman Decl. ¶ 15.

As noted, Cook Group, CMH, and CMT contend that this Court lacks personal jurisdiction over them. For ease of discussion, the Court will distinguish the two groups of defendants by referring to the defendants who contest personal jurisdiction collectively as the "Parents" and individually as "Cook Group(P)," "CMH(P)," and "CMT(P)."[4]

### C. History of the Amplatz Contracts

The original parties to the 1983 contract were Amplatz and Cook. Whetham Dep. 232. Under that contract, Cook was obligated to pay annual royalties to Amplatz for a limited term based on sales of four products that Amplatz had helped to develop and that were identified in the contract. Gilbert Decl. Ex. 3 [ECF No. 277-2 at 5]. The contract contemplated that, "[s]hould new products be developed, they could be added

---

[4]The Court acknowledges that this designation is not entirely accurate, as CMT does not appear to be the parent company of anything and is actually a subsidiary of Cook and other Cook entities. But because the similarity of the entities' names makes it difficult to keep track of them in the course of a lengthy discussion, this rough division will have to do.

to the agreement, but they would have different ending dates for the term of their agreement." *Id.*

The original parties to the 1995 contract were Amplatz and an entity called Cook Urological Inc. Whetham Dep. 232–33. Under that contract, Cook Urological Inc. was obligated to pay Amplatz semiannual royalties based on the sales of a single product identified as the "Madduri/Amplatz Urethral Access Set." Gilbert Decl. Ex. 3 [ECF No. 277-2 at 4]. The contract was to continue until December 31, 2000, "at which time it shall be reviewed and, if no changes are proposed, will be automatically renewed." *Id.*

Cook Urological Inc. was later folded into Cook, which at that point became a party to both the 1983 and 1995 contracts. Whetham Dep. 233. Following the formation of CMT(P) as an intellectual-property holding company in 2010, the Amplatz contracts were assigned to CMT(P), along with all of the other intellectual property owned or licensed by Cook-related entities.[5] Whetham Dep. 229, 233, 244. CMT(P) licenses the Amplatz contracts back to Cook to practice. Whetham Dep. 230, 242, 249. (As noted, Cook is a manufacturer of medical devices.)

---

[5]Defendants contend that the Amplatz contracts were no longer in force by the time CMT(P) was formed. Viewing the record in the light most favorable to Security, however, the Court finds that there is sufficient evidence for a jury to find that both the 1983 and 1995 contracts were still in force and therefore were assigned to CMT(P).

Cook funded the Amplatz royalty payments up until 2017, after which they were funded by CM.[6]  Whetham Dep. 257, 264–65; Richardson Dep. 34.  Payments to Amplatz were made by check and were accompanied by a cover letter, a sales report, and other documents supporting the calculation of the royalties due.  Irie Dep. 53–56, 62.  At least some of the cover letters—notably, cover letters that were written long after 2000—referred to the parties' "contract" and otherwise implied that Cook regarded the 1983 and 1995 contracts as remaining in effect.  Irie Dep. 57; Gilbert Decl. Ex. 6 [ECF No. 277-5] (2012 and 2014 letters from "Cook Medical" to Amplatz stating that "[t]he royalty agreement is now entering" the 31st, 32nd, and 33rd "year of the contract," respectively).

John Brumleve and Walter Ryan were responsible for overseeing royalty payments to Amplatz under the 1983 and 1995 contracts, respectively.[7]  Irie Dep. 18–20; Ryan Dep. 29–30, 34–35.  This responsibility included identifying products on which royalties were owed.  Richardson Dep. 72–74; Irie Dep. 76–77.  Accounting personnel

---

[6]Daniel Whetham, a Cook Group(P) attorney, initially testified that CMT(P) funded the royalties, but then later testified that Cook and CM funded the royalties. *Compare* Whetham Dep. 245, 249–50 *with id.* at 257, 264–65.  Security relies on the latter testimony, ECF No. 274 at 16, and the Court therefore treats that testimony as true for purposes of ruling on defendants' motion.

[7]The record is somewhat muddled as to the timeframe during which Ryan was responsible for the Amplatz contracts and if or when anyone took over those responsibilities from Ryan.

Robin Irie and (later) Mo Drabicki were responsible for calculating the amount of the royalties owed.  Richardson Dep. 14, 20, 31–32, 36–37, 41; Irie Dep. 13, 18.  So far as the Court can tell, the record does not indicate which Cook entities employed Brumleve, Ryan, Irie, or Drabicki during the relevant timeframes, but both Irie and Drabicki reported to Patrick Richardson, a Cook Group(P) finance director.[8]  Richardson Dep. 7, 14, 20.

Irie had annual meetings with Brumleve and Ryan to go over the royalty payments, make sure that all of the sales information was correct, verify which products were covered, and ensure that she was supposed to continue paying royalties.  Irie Dep. 22–25.  Depending on the amount of the payments, other corporate officers might also review them.[9]  Irie Dep. 39, 54–55, 59.  Based on her meetings with Brumleve and Ryan, Irie understood that royalties were to be paid to Amplatz until the end of his life.  Irie Dep. 22, 25.

---

[8]According to Irie herself, she reported to Jeri Souto, a finance director whose employer does not seem to be clearly identified in the record.  Irie Dep. 13; Richardson Dep. 13–14.  According to Richardson, though, Souto did not report to him, Richardson Dep. 13, and thus the discrepancy cannot be explained by assuming that Souto was in Richardson's chain of command.  Again, however, as Security takes the view that Irie and Drabicki reported to Richardson, the Court treats that as true for purposes of ruling on defendants' motion to dismiss.

[9]Again, the record does not seem to clearly identify which entity employed these reviewing officers, although one of those officers—Kelly Fischer—may have been employed by CMH(P).  Whetham Dep. 174.

Irie never spoke or met with Amplatz.  Irie Dep. 19–20.  Ryan testified that his overview of the royalties was merely a ministerial task, that he had no other responsibilities with respect to Amplatz, and that he does not remember if he ever spoke or met with Amplatz.  Ryan Dep. 29–30, 32.  Brumleve spoke with Amplatz on a few occasions and, during the time that he was responsible for overseeing Amplatz's royalty payments, met with him socially three times (twice in Minnesota).  Brumleve Dep. 20–21, 28–29, 177–79.

In late 2019, Amplatz's estate-planning counsel contacted Brumleve to ask that the royalty payments be made to a trust instead of to Amplatz personally.  Whetham Dep. 78–79, 81–82, 106–07.  Daniel Whetham, the Cook Group(P) attorney, was prepared to approve the change.  Whetham Dep. 82, 111.  But shortly after the request was made, Amplatz died.  After learning of Amplatz's death and consulting with outside counsel, Whetham made the decision to altogether terminate the royalty payments.  Whetham Dep. 91, 253–54.  Even though Irie testified that Amplatz was entitled to royalty payments up to the date of his death, the Cook entities failed to pay Amplatz royalties for the months preceding his death in late 2019.  Irie Dep. 86–87, 108; Whetham Dep. 191–92.

## II.  ANALYSIS

### A.  Personal Jurisdiction

The Parents—Cook Group(P) (owner of CMH(P)), CMH(P) (owner of Cook and CM), and CMT(P) (holder of the Amplatz royalty contracts)—move under Fed. R. Civ. P. 12(b)(2) to dismiss for lack of personal jurisdiction.  The Court must resolve this issue before addressing defendants' Rule 12(b)(6) motion.  *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." (cleaned up)); *Kangas v. Kieffer*, 495 F. App'x 749, 750 (8th Cir. 2012) ("A court may not resolve a case on its merits unless the court has jurisdiction over both the claims and the parties in the suit.") (per curiam).

The plaintiff bears the burden of making a prima facie showing of jurisdiction, and in deciding whether the plaintiff has made such a showing, the court must view the evidence in the light most favorable to the plaintiff.[10]  *See Whaley v. Esebag*, 946 F.3d 447,

---

[10]The plaintiff also bears the ultimate burden of proving, by a preponderance of the evidence, that the court in fact has personal jurisdiction over the defendant.  But "[w]hile the plaintiffs bear the ultimate burden of proof, jurisdiction need not be proved by a preponderance of the evidence until trial or until the court holds an evidentiary hearing."  *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003).  Recently, the Eighth Circuit clarified that a "hearing" in this context does not necessarily require the presentation of live, in-person testimony, but instead may be limited to the consideration of deposition transcripts and other written evidence.  *See Hawkeye Gold, LLC v. China Nat'l Materials Indus. Imp. & Exp. Corp.*, 89 F.4th 1023, 1030–31 (8th Cir.

(continued...)

451 (8th Cir. 2020).  However, "[t]he plaintiff's prima facie showing must be tested, not by the pleadings alone, but by the affidavits and exhibits presented with the motions and in opposition thereto."  *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1072 (8th Cir. 2004) (cleaned up).  "[C]onclusory allegations" of minimum contacts in the complaint are insufficient to establish a prima facie case.  *Id.* at 1074.

 "[T]o ensure that personal jurisdiction exists, a federal district court must satisfy itself that hearing the case is consistent with both the law of the forum state and due process."  *Pederson v. Frost*, 951 F.3d 977, 979 (8th Cir. 2020).  Minnesota's long-arm statute is coextensive with the Due Process Clause, so the only question is whether this Court's exercise of personal jurisdiction comports with due process.  *Id.* at 980.

Courts recognize two categories of personal jurisdiction: (1) general jurisdiction, which exists when a defendant is "essentially at home" in the forum and permits a

---

[10](...continued)
2023).  In *Hawkeye Gold*, the Eighth Circuit surveyed the procedural history of the parties' jurisdictional dispute and concluded that the record was "sufficient to require Hawkeye Gold to establish personal jurisdiction by a preponderance of the evidence."  *Id.* at 1031–32.

Here, the parties have completed fact discovery, and therefore it appears that the issue of whether Security has established personal jurisdiction by a preponderance of the evidence is ripe for resolution.  But defendants have not disputed Security's assertion that it need only make a prima facie case.  Accordingly, the Court applies the "prima facie" standard.  As explained above, in deciding whether that standard has been met, the Court need not conduct an evidentiary hearing, but may consider evidence outside of the pleadings.

court to hear any type of claim against the defendant; and (2) specific jurisdiction, which exists when a defendant has sufficient contacts with the forum and the plaintiff's claim "arises out of or relates to [those] contacts." *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014) (cleaned up).  Security contends that there is both general and specific jurisdiction over the Parents.

Security's claim that this Court can exercise general jurisdiction over the Parents borders on frivolous.  A corporation's "place of incorporation and principal place of business are paradigm bases for general jurisdiction." *Id.* at 137 (cleaned up).  None of the Parents are organized under Minnesota law or maintain their principal place of business in Minnesota.  Outside of that context, establishing general jurisdiction over a corporation is very difficult.  It is not sufficient, for example, to show that the corporation "engages in a substantial, continuous, and systematic course of business" in the forum. *Id.* at 137–38 (citation omitted).  Instead, the corporation's in-state activities must be "so continuous and systematic as to render it essentially at home in the forum State." *Id.* at 138–39 (cleaned up).

Security cannot possibly meet the "essentially at home" threshold with respect to any of the Parents, which do not make, market, or distribute any products; have no employees, offices, or real estate in Minnesota; and are not even registered to do

business in Minnesota.  *See* Lehman Decl. ¶¶ 5–7, 11–13, 17–19.[11]  Instead of pointing to contacts specific to each defendant, Security generically cites "[t]he long history of Cook's business relationship with Dr. Amplatz in Minnesota" to contend that the Court has general jurisdiction.  ECF No. 274 at 33.  Even if Security's attempt to lump all of the Cook entities together were legally sound—and it is not—the lengthy nature of the contractual relationship between Amplatz and some of the Cook subsidiaries would not be a sufficient basis for exercising general jurisdiction over the Parents.  *Daimler AG*, 571 U.S. at 137–38 (showing that a corporation engages in a substantial, continuous, and systematic course of business is not sufficient); *cf. Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358–59 (2021) (recognizing that neither Minnesota nor Montana have general jurisdiction over Ford Motor Company).  The Court accordingly turns to the issue of specific jurisdiction.

"To establish specific personal jurisdiction, the defendant's contacts with the forum State must be based on some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  *Hawkeye Gold*, 89 F.4th at 1032 (cleaned up).

---

[11]The Court notes that Whetham testified that "[m]arketing is still done back at the divisions," which "are under [CMH(P)]."  Whetham Dep. 235.  Security does not discuss this testimony, however, nor does Security offer any other information about marketing activities by CMH(P) (or any other Cook entity) in Minnesota (or elsewhere).

-13-

> In determining whether specific jurisdiction exists, we
> consider the totality of the circumstances, using five factors
> to guide our analysis: (1) the nature and quality of
> defendant's contacts with the forum state; (2) the quantity of
> such contacts; (3) the relation of the cause of action to the
> contacts; (4) the interest of the forum state in providing a
> forum for its residents; and (5) convenience of the parties.

*Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 952 (8th Cir. 2022) (cleaned up).

"The first three factors are of primary importance and the fourth and fifth factors carry

less weight." *Id.* (citation and quotation marks omitted).

### 1. Contacts

#### a. Alter Ego

Security's overarching contention is that, for personal-jurisdiction purposes, the

Court should treat Cook and CM (over which the Court has personal jurisdiction) as

instrumentalities or alter egos of the Parents.

> [P]ersonal jurisdiction can be based on the activities of the
> nonresident [parent] corporation's in-state subsidiary, but
> only if the parent so controlled and dominated the affairs of
> the subsidiary that the latter's corporate existence was
> disregarded so as to cause the residential [subsidiary]
> corporation to act as the nonresidential [parent] corporate
> defendant's alter ego.

*Epps*, 327 F.3d at 648–49.[12]  To determine whether to pierce the corporate veil for

jurisdictional purposes, courts look to state law.  *Id.* at 649.

In *Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509 (Minn. 1979), the

Minnesota Supreme Court directed courts to consider the following factors in

determining whether to pierce a corporate veil:

> Factors considered significant in the determination include:
> insufficient capitalization for purposes of corporate
> undertaking, failure to observe corporate formalities,
> nonpayment of dividends, insolvency of debtor corporation
> at time of transaction in question, siphoning of funds by
> dominant shareholder, nonfunctioning of other officers and
> directors, absence of corporate records, and existence of
> corporation as merely facade for individual dealings.

*Id.* at 512.  "Disregard of the corporate entity requires not only that a number of these

factors be present, but also that there be an element of injustice or fundamental

unfairness."  *Id.*  Security has not addressed any of the *Victoria Elevator* factors and

nothing in the record suggests that any of them are present.  Plainly, then, there is no

justification for piercing under *Victoria Elevator*.[13]

---

[12]As discussed below, the Eighth Circuit has qualified the categorical statement in *Epps* to clarify that, even when veil piercing is not warranted, the activities of an in-state subsidiary may nevertheless be relevant to the issue of personal jurisdiction over the out-of-state parent.  *See Anderson v. Dassault Aviation*, 361 F.3d 449, 452–53 (8th Cir. 2004).

[13]Security contends that Whetham testified that Cook and CM "are not stand-alone entities.  Those are divisions within the Cook Medical line of business."  ECF

(continued...)

That said, the Minnesota Court of Appeals appears to have adopted a somewhat lower standard for veil piercing in the context of establishing personal jurisdiction over a parent corporation on the basis of a subsidiary's contacts with the forum. *See JL Schwieters Constr., Inc. v. Goldridge Constr., Inc.*, 788 N.W.2d 529, 535–36 (Minn. Ct. App. 2010). In that context, *JL Schwieters* described the following factors as relevant:

> (1) the parent conducted business through "wholly owned," "closely interrelated" subsidiaries; (2) the parent and subsidiary maintained offices in the same location; (3) [the] directors of the subsidiary were also directors of the parent; (4) the corporations shared a number of officers; (5) the corporations issued consolidated financial statements and tax returns; (6) the parent guaranteed the credit facility of the subsidiary and funded its pension plan; (7) the parent held itself out as having substantial control of the subsidiary and did in fact have substantial control; and (8) the parent-subsidiary relationship appeared to be a convenient way for the parent to organize its own business.

*Id.* at 536 (citing *Scott v. Mego Int'l, Inc.*, 519 F. Supp. 1118, 1126 (D. Minn. 1981) (Murphy, J.)).

---

[13](...continued)
No. 274 at 31. Security accurately quotes Whetham's deposition testimony, but Whetham was not describing Cook and CM. Instead, Whetham was referring to cross-entity business divisions (called "vascular" and "medsurg") that are customer-facing sales divisions focused on particular medical subspecialties. Whetham Dep. 204–05, 227–28, 241–42 (Cook manufactures and CM sells both vascular and medsurg products); Richardson Dep. 34 (vascular and medsurg are sales divisions not housed within a particular entity); Ryan Dep. 124 (describing the business-unit designations within vascular and medsurg as a "simply reflect[ing] the product families that are being sold").

It is unclear whether the Minnesota Supreme Court would adopt this test, which conflicts in some respects with *Victoria Elevator*. *See also United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (under ordinary principles of corporate law, "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts" (citation omitted)); *id.* ("Control through the ownership of shares does not fuse the corporations, even when the directors are common to each." (citation omitted)).  In any event, Security has not met its burden to show that piercing would be justified even under *JL Schwieters*.

To begin with, Security has not cited *JL Schwieters* or similar cases and therefore has not addressed the factors identified by those cases in any systematic way.  In particular, Security has cited no evidence that any of the Parents share corporate officers or directors with either Cook or CM, that the Parents issue consolidated financial statements and tax returns with either Cook or CM, or that the Parents fund or guarantee Cook's or CM's financial obligations.

Security does offer evidence that, as a general matter, Cook Group(P) and CMH(P) exercise management and direction over Cook and CM.  *See* Whetham Dep. 237–38 (CMH(P) directs the various Cook Medical-aligned companies); Richardson Dep. 7–8 (Cook Group(P) embeds finance personnel into marketing groups

to help support financial forecasting, planning, and analysis); Gilbert Decl. ¶ 26 & Ex. 26 [ECF No. 227-24] (Cook Group(P) records-management policy applicable to all Cook entities); *id.* ¶ 28 & Ex. 28 [ECF No. 227-25] (Cook Group(P) website, including link to "Cook Group global code of conduct").  But this evidence is insufficient to show that Cook Group(P) or  CMH(P) "dominate[]" or "completely control[]" Cook or CM.  *Cf. JL Schwieters*, 788 N.W.2d at 536 ("Similar to *Lakota Girl Scout Council*, in which there was a single shareholder who dominated his corporation, here, Goldridge Group was the sole owner of White Pines LLC and completely controlled the LLC for its own purposes."); *Viasystems, Inc. v. EBM-Papst St. Georgen GmbH & Co., KG*, 646 F.3d 589, 596 (8th Cir. 2011) ("we have always required a degree of control and domination by the parent corporation that is absent here"); *cf. Bestfoods*, 524 U.S. at 72 (activities such as "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures, should not give rise to direct liability" (citation omitted)).  Security has thus failed to make a prima facie case for piercing the veil under either *Victoria Elevator* or *JL Schwieters*.

### b.  The Parents' Minnesota Contacts

As Security has failed to establish jurisdiction under an alter-ego theory, the next question is whether the Parents' own contacts with Minnesota are sufficient to enable

this Court to exercise personal jurisdiction over them.  In conducting this inquiry, the

Court examines the contract and tort claims separately.  *See Bros. & Sisters in Christ, LLC*,

42 F.4th at 952 (courts must consider "the relation of the cause of action to the contacts")

(citation omitted)).

Although the Court has found no basis for piercing the corporate veil, that does

not mean that Cook's and CM's Minnesota contacts are irrelevant to the jurisdictional

inquiry:

> [E]ven if the in-state subsidiary of a foreign corporation is
> not its corporate parent's alter ego, a lesser relationship
> between the two corporations remains a relevant factor in
> determining whether the foreign corporation purposefully
> directed its products to the United States, and specifically to
> the forum state, through the distribution system it set up in
> this country.

*Viasystems*, 646 F.3d at 596 (cleaned up); *see also Anderson v. Dassault Aviation*, 361 F.3d

449, 453 (8th Cir. 2004) ("Dassault Aviation and Dassault Falcon Jet have a close,

synergistic relationship that is not an abuse of the corporate organizational form, but is

clearly relevant to the jurisdictional question.").

That said, "mere placement of a product into the stream of commerce, without

more, does not constitute an act of the defendant purposefully directed toward the

forum State."  *Viasystems*, 646 F.3d at 597 (cleaned up).  Instead, there must be some

additional showing that the corporation's products were purposefully directed at the

-19-

specific forum. *Id.* (recognizing " a variant of 'stream-of-commerce' jurisdiction over a foreign manufacturer that pours its products into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area" (cleaned up)); *Anderson*, 361 F.3d at 452–55 (finding jurisdiction over parent based on subsidiary's extensive ties to Arkansas, including the presence of a corporate office and its largest production site, which was the "main completion center for all Falcon jets worldwide" and employed more workers than any of the parent company's French plants).

In contrast to *Anderson*, in this case there is no evidence that Cook or CM do anything other than place their products into the nationwide stream of commerce. Whetham Dep. 240–42 (Cook manufacturers medical products and sells them to CM, who is the exclusive distributor of the products in North America). Cook's and CM's Minnesota sales are therefore of little relevance in determining whether there is jurisdiction over Cook Group(P), CMT(P), or CMH(P).

Aside from selling Cook products in Minnesota, Cook and CM also had contact with Minnesota insofar as they funded the royalty payments made to Amplatz. The Court considers the relevance of these contacts in the context of the larger constellation of the Parents' own contract-related contacts with Minnesota.

I.  Contract Claims

A contract between an out-of-state party and a forum resident is insufficient in itself to establish personal jurisdiction over the out-of-state party.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985).

> For contractual claims, personal jurisdiction is proper where the defendant "reach[es] out beyond one state and create[s] continuing relationships and obligations with citizens of another state."  *Burger King Corp.*, 471 U.S. at 473, 105 S. Ct. 2174 (internal quotation marks omitted).  But a contract with a citizen of a State alone is insufficient to establish minimum contacts with that forum.  *Id.* at 478, 105 S. Ct. 2174.  To determine whether a defendant purposefully established minimum contacts with the forum, we must evaluate "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing."  *Id.* at 479, 105 S. Ct. 2174.

*Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 980 (8th Cir. 2015).

As discussed above, the 1983 contract was originally with Cook, and the 1995 contract was with another Cook entity.  After the other entity ceased to exist, Cook became a party to both contracts, and remained a party until 2010 (when the contracts were transferred to CMT(P)).  As Cook does not contest jurisdiction, the Court already has before it the party that negotiated and entered into the 1983 contract and that was a party to both the 1983 and 1995 contracts for most of their existence.  And together with CM (which also does not contest jurisdiction), the Court has before it the two parties

that have consistently practiced the rights under the contracts and funded the Amplatz royalty payments.

   With this background in mind, the Court finds that the contracts are insufficient to establish personal jurisdiction over Cook Group(P) or CMH(P).  To begin with, neither of these entities has ever been a party to either contract, and Security cites no evidence of *any* Minnesota contact by CMH(P).

As for Cook Group(P), Security highlights the fact that Whetham, a Cook Group(P) lawyer, made the decision to terminate the contracts.  But the termination of a contract—even by a party to that contract—is not sufficient to create personal jurisdiction.  *See Morningside Church, Inc. v. Rutledge*, 9 F.4th 615, 621 (8th Cir. 2021) ("no personal jurisdiction existed in a quantum meruit suit even though the defendant allegedly terminated the contract through a letter sent to the plaintiff in the forum state" (citing *Eagle Tech. v. Expander Americas, Inc.*, 783 F.3d 1131, 1136–37 (8th Cir. 2015)).

Security also points to the fact that Richardson, a Cook Group(P) employee, supervised the accounting personnel who calculated the royalty payments, and the fact that other high-level Cook officers reviewed those calculations.  This activity occurred entirely outside of Minnesota, however, and the calculation and payment of the royalties appears to have been a ministerial task that involved no contact with Amplatz (other than sending the payments and associated paperwork to him).  The Court

therefore concludes that there are insufficient contacts between Cook Group(P) and Minnesota with respect to the contract claims.

That leaves CMT(P), which is at least a party to the contracts.  As noted, however, the fact that CMT(P) entered into a contract with a citizen of Minnesota is insufficient to confer personal jurisdiction over CMT(P).  Moreover, so far as the Court can tell from the record before it, CMT(P) had no other contacts with Minnesota.  Given the contracts' lengthy history, however, the Court also has considered whether, under *Anderson* and *Viasystems*, the other Cook entities' contract-related Minnesota contacts are sufficient to establish personal jurisdiction over CMT(P).  *See Anderson*, 361 F.3d at 453 (noting that a "close, synergistic relationship that is not an abuse of the corporate organizational form" is nevertheless "clearly relevant to the jurisdictional question").

In theory, the long-term contractual relationship between Amplatz and Cook could support the exercise of contract-related personal jurisdiction over CMT(P), Cook's successor as a party to the contracts.  But Security cites almost no record evidence of any contract-related contact with Minnesota by Cook or any other Cook entity, other than the royalty payments regularly sent to Minnesota.[14]  True, there is deposition testimony regarding Amplatz developing products with and testing products for Cook,

---

[14]As discussed above, because there is no evidence that Cook or CM do anything other than place their products into the nationwide stream of commerce, their Minnesota sales are of little relevance under *Viasystems* and *Anderson*.

but there does not appear to be any evidence of when or where those activities took place. Nor is there much if any evidence concerning what Amplatz did to develop and test products; the little relevant evidence in the record suggests that Amplatz mostly came up with ideas, while the development and implementation of those ideas occurred at Cook facilities. *See* Brumleve Dep. 36, 39–40.

Security mentions an occasion in the 1980s when Cook sent a company plane to fly Amplatz from Minnesota to Indiana. Gilbert Decl. Ex. 12 [ECF No. 277-11]. But even that incident involved Amplatz *leaving* Minnesota to attend an event in Indiana. *Id.* The record likewise contains little evidence of any contact (other than royalty payments) between Amplatz and any Cook entity at least since 2010, when CMT(P) took over the contracts. And as noted above, the calculation and payment of the royalties appears to have been an accounting function that did not involve any meaningful contact with Amplatz.

Given the length of the parties' contractual relationship, the question of personal jurisdiction over CMT(P) is a close one. Having carefully considered the issue, however, the Court concludes that, while there is certainly evidence of a relationship between CMT(P) and *Amplatz*, there is insufficient evidence that CMT(P)—even when considering the other Cook entities' contract-related contacts—purposefully created a relationship with *Minnesota*. *See Walden v. Fiore*, 571 U.S. 277, 285 (2014) ("[O]ur

'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there.").

For these reasons, the Court concludes that Security has failed to offer evidence of sufficient contract-related contacts between Minnesota and any of the Parents.

### ii. Tort Claims

Security also brings tort claims for unfair competition and violation of the right of publicity. Both of these claims rest on Security's allegation that defendants are using the Amplatz name to sell products without authorization. Am. Compl. ¶¶ 74–83.

"A forum State's exercise of jurisdiction over an out-of-state intentional tortfeasor must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." *Walden*, 571 U.S. at 286. Cook and CM (the manufacturer and distributor) are the only entities actually committing the alleged torts, and, as noted above, both concede that they are subject to the jurisdiction of this Court. By contrast, there is no evidence of any connection between any of the Parents and any of the alleged torts, other than the generic evidence that Cook Group(P) and CMH(P) exercise management and direction over Cook and CM—generic evidence that the Court has already found to be insufficient to pierce the corporate veil or give rise personal jurisdiction under *Viasystems* or *Anderson*.

Nor is this a case in which the tort and contract claims are so interrelated that any contact between the defendant and the forum would necessarily be relevant to both types of claims. *Cf. K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 595 (8th Cir. 2011) ("KV's breach-of-contract and misappropriation-of-trade-secrets claims are related to the contacts that Uriach had with Missouri . . . . If these companies had not been involved in a long-term contractual relationship with each other, Uriach would not have had access to KV's alleged trade secrets."). And in any event, the Court has already concluded that the Parents' contract-related contacts with Minnesota are insufficient.

The Court therefore concludes that the Parents do not have sufficient contacts with Minnesota to permit this Court to exercise personal jurisdiction over them.

2.  Minnesota's Interest and Parties' Convenience

As there are insufficient contacts to justify the exercise of personal jurisdiction over the Parents, the remaining factors are largely irrelevant—and, in any event, they are a wash. Minnesota certainly has an interest in providing a forum to adjudicate the Amplatz estate's alleged rights, but that interest is not appreciably stronger than the interest of Indiana in the same dispute, as all of the defendants are at home in Indiana. Similarly, the convenience of the parties does not weigh one way or the other, as both sides appear capable of litigating in either Minnesota or Indiana.

For these reasons, the Court finds that it cannot exercise personal jurisdiction over Cook Group(P), CMH(P), or CMT(P).  All claims against those defendants are therefore dismissed without prejudice for lack of jurisdiction.

### B. Sufficiency of the Amended Complaint

Having dismissed the claims against Cook Group(P), CMH(P), and CMT(P) under Rule 12(b)(2), the Court now turns to Cook's and CM's Rule 12(b)(6) motion.

In reviewing a motion for failure to state a claim under Rule 12(b)(6), a court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Perez v. Does 1–10*, 931 F.3d 641, 646 (8th Cir. 2019).  Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.

When ruling on a Rule 12(b)(6) motion, a court may typically consider only the face of the complaint and any materials attached to or necessarily embraced by the complaint.  This case is in a highly unusual posture, however, as fact discovery is complete, and the Court has had to review much of the evidence produced in discovery in order to resolve the Parents' challenge to personal jurisdiction.  Having reviewed that evidence, the Court declines to dismiss the claims against Cook and CM.  Security's

amended complaint may be somewhat lacking in specifics, but at this point Cook and CM are well aware of the basis of Security's contract claims—namely, that for nearly two decades after the date on which Cook and CM now claim the royalty contracts expired, Cook and CM continued to pay royalties to Amplatz. Moreover, those royalty payments were accompanied by cover letters referring to the parties' decades-long "contract," and those royalty payments were calculated pursuant to the terms of the contracts. Likewise, Security's tort claims are obviously based on Cook's and CM's conduct in continuing to manufacture and sell products using the Amplatz name after ceasing to pay royalties. Defendants' Rule 12(b)(6) motion is therefore denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Defendants' motion to dismiss [ECF No. 260] is GRANTED IN PART and DENIED IN PART.

2.  Defendants' motion is GRANTED with respect to all claims against defendants Cook Group, Inc., Cook Medical Holdings LLC, and Cook Medical Technologies LLC. Those claims are DISMISSED WITHOUT PREJUDICE for lack of personal jurisdiction.

3.  Defendants' motion is DENIED in all other respects.

4.      Defendants' objection [ECF No. 225] is OVERRULED AS MOOT.

Dated:  February 26, 2024                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz, Chief Judge
                                             United States District Court