UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

SECURITY BANK & TRUST COMPANY,
Personal Representative of the Estate of
Kurt A. Amplatz,

Case No. 21-CV-2572 (PJS/JFD)

Plaintiff,

ORDER

v.

COOK INC. and COOK MEDICAL LLC,

Defendants.

---

Edward F. Fox, Lewis A. Remele, Jr., Jeffrey R. Mulder, and Gillian L. Gilbert,
BASSFORD REMELE; Christopher H. Yetka and Sarah DeWitt Greening,
LARKIN HOFFMAN DALY & LINDGREN LTD., for plaintiff.

James R. Ferguson and Luiz Miranda, MAYER BROWN LLP; Nathaniel J.
Zylstra, FAEGRE DRINKER BIDDLE & REATH LLP, for defendants.

Plaintiff Security Bank & Trust Company ("Security") is the personal

representative of the estate of Dr. Kurt Amplatz ("the Estate").[1]  Amplatz was a world-

renowned physician and inventor who developed numerous medical devices and

technologies.  For nearly 40 years, Amplatz had a working relationship with defendant

Cook Inc., which later expanded to include defendant Cook Medical LLC ("Cook

Medical") (collectively "Cook").  Cook paid royalties to Amplatz and used his name in

---

[1]This action was originally brought by James H. Gilbert in his capacity as special
administrator of the Amplatz estate.  ECF No. 1-1.  After Security was appointed as the
personal representative of the estate, the parties agreed to substitute Security as the
plaintiff.  ECF Nos. 22, 24.

connection with some of the products that it manufactured and distributed. Following Amplatz's death in 2019, however, the relationship between Amplatz's estate and Cook quickly soured, and this litigation followed. On behalf of the Estate, Security brings breach-of-contract, right-of-publicity, and related claims against Cook Inc. and Cook Medical.[2] Cook counterclaims against the Estate for breach of contract and unjust enrichment.

Cook Inc. manufactures medical products, while Cook Medical acts as the exclusive distributor of those products in North America. The Estate's claims arise out of two royalty contracts between Amplatz and Cook Inc., one executed in 1983 and the other in 1995. The Estate alleges that Cook owes royalties to Amplatz's estate under the two contracts and that Cook has refused to pay those royalties despite continuing to use Amplatz's name. The Estate also claims that Cook's continued use of the Amplatz name is a violation of Amplatz's right of publicity.

In response, Cook admits that it has stopped paying royalties to the Estate and that it nevertheless continues to make commercial use of the Amplatz name. Cook contends, however, that the royalty contracts expired years before Amplatz's death and,

---

[2]As explained in the Court's order on defendants' motion to dismiss, there were originally five Cook defendants in this action: (1) Cook Inc.; (2) Cook Medical; (3) Cook Group, Inc.; (4) Cook Medical Holdings LLC; and (5) Cook Medical Technologies LLC. The Court granted defendants' motion to dismiss the latter three defendants for lack of personal jurisdiction. ECF No. 290.

in any event, the Estate's contract claims fail for lack of consideration and other reasons. Cook further argues that the Amplatz name has become generic or descriptive and therefore is freely available for the public to use. Cook counterclaims against the Estate for unjust enrichment and breach of contract, seeking a return of royalty payments that it made to Amplatz after the contracts allegedly expired.

This matter is before the Court on Cook's motion for summary judgment and the Estate's motion for partial summary judgment. Cook seeks judgment in its favor both on the Estate's claims against it and on its counterclaim against the Estate for unjust enrichment. The Estate, for its part, moves for summary judgment on a portion of its breach-of-contract claim against Cook and for summary judgment on all of Cook's counterclaims against it.

For the reasons that follow, both motions are granted in part and denied in part. Specifically, the Court (1) grants Cook's motion for summary judgment as to the Estate's claims for promissory estoppel and unfair competition; (2) grants the Estate's motion for summary judgment on all of Cook's counterclaims; and (3) grants summary judgment to the Estate and against Cook on the issue of whether Amplatz waived or abandoned his right to control the commercial use of his name. The parties' motions are denied in all other respects.

## I. BACKGROUND

The original parties to the 1983 contract were Amplatz and Cook Inc.  Whetham Dep. 232 [ECF No. 201-1].  Under the 1983 contract, Cook Inc. agreed to pay annual royalties to Amplatz for a limited term based on sales of four products that Amplatz had helped to develop and that were identified in the contract.  ECF No. 277-2 at 5–6.[3] The contract contemplated that, "[s]hould new products be developed, they could be added to the agreement, but they would have different ending dates for the term of their agreement."  *Id.* at 5.

The original parties to the 1995 contract were Amplatz and an entity called Cook Urological Inc.  Whetham Dep. 232–33 [ECF No. 206-1].  Under the 1995 contract, Cook Urological Inc. agreed to pay Amplatz semiannual royalties based on the sales of a single product identified as the "Madduri/Amplatz Urethral Access Set."  ECF No. 277-2 at 4.  The contract was to continue until December 31, 2000, "at which time it shall be reviewed and, if no changes are proposed, will be automatically renewed."  *Id.*

Cook Urological Inc. was later folded into Cook Inc., which at that point became a party to both the 1983 and 1995 contracts.  Whetham Dep. 233 [ECF No. 206-1]. Following the formation of Cook Medical Technologies LLC ("CMT") as an intellectual-property holding company in 2010, the Amplatz contracts were assigned to CMT, along

---

[3]When citing documents by ECF number, the Court cites to the page numbers generated by the Court's docketing system.

with all of the other intellectual property owned by or licensed to Cook-related entities.[4]

Whetham Dep. 229–30, 233, 244 [ECF No. 206-1]; ECF No. 265 ¶ 14.  CMT licenses the

Amplatz contracts back to Cook Inc. to practice.  Whetham Dep. 230, 242, 249 [ECF No.

206-1].

Cook Inc. funded the Amplatz royalty payments up until 2017, after which those

payments were funded by CMT.  Whetham Dep. 257, 264–65 [ECF No. 206-1];

Richardson Dep. 34 [ECF No. 277].  In some of Cook's cover letters accompanying the

royalty payments—letters that were written long after 2000, when Cook now claims the

last of the two contracts expired—Cook referred to the parties' "contract" and otherwise

implied that Cook regarded the 1983 and 1995 contracts as remaining in effect.  Irie

Dep. 57 [ECF 206-2]; ECF No. 277-5 (2012 and 2014 letters from "Cook Medical" to

Amplatz stating that "[t]he royalty agreement is now entering" the 31st, 32nd, and 33rd

"year of the contract," respectively).

In late 2019, Amplatz's estate-planning counsel contacted Cook to ask that the

royalty payments be made to a trust instead of to Amplatz personally.  Whetham

Dep. 78–79, 81–82, 106–07 [ECF No. 206].  Cook was prepared to approve the change,

Whetham Dep. 82, 111 [ECF No. 206], but shortly after the request was made, Amplatz

---

[4]As noted, Cook contends that the Amplatz contracts were no longer in force by
the time CMT was formed.  Viewing the record in the light most favorable to the Estate,
however, the Court finds that there is sufficient evidence for a jury to find that the 1983
and 1995 contracts were still in force and therefore were assigned to CMT.

died.  After learning of Amplatz's death and consulting with outside counsel, Cook decided to terminate the royalty payments.  Whetham Dep. 91, 253–54 [ECF Nos. 206, 206-1].  Even though Cook's original position seemed to be that Amplatz was entitled to royalty payments until the end of his life, Cook refused to pay Amplatz royalties for the months preceding his death in late 2019.  Irie Dep. 86–87, 108 [ECF No. 206-2]; Whetham Dep. 82, 111, 191–92 [ECF Nos. 206, 206-1].

## II.  ANALYSIS

### A.  Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

*B. The Estate's Claims*

1. Contract and Related Claims (Counts 1–5)

Cook moves for summary judgment on the Estate's contract claims (Counts 1 and 2) and on the Estate's alternative claims for unjust enrichment and breach of the covenant of good faith and fair dealing.[5] The Estate moves for partial summary judgment in its favor, seeking a ruling that the royalty contracts were in force through 2019—or, in the alternative, at least through the date of Amplatz's death—and awarding the Amplatz estate the corresponding amount of royalties. The Court denies both parties' motions on these claims.

As the Court explained in its order on Cook's motion to dismiss, there is ample evidence that the parties had one or more implied-in-fact contracts at least through the date of Amplatz's death. But the terms and exact duration of that contract or contracts are disputed factual issues that must be resolved by a jury. For that reason, all arguments that depend on the duration or terms of the contracts—such as arguments that Cook terminated the contracts, or that the contracts terminated upon Amplatz's

---

[5]The Estate has withdrawn its claims for promissory estoppel and unfair competition. *See* ECF No. 310 at 28. Accordingly, the Court treats Cook's motion for summary judgment on those claims as unopposed and grants it. *See* Fed. R. Civ. P. 41(a)(2) ("Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper.").

death, or that the contracts survived Amplatz's death—will have to be resolved by a jury.

Cook argues that, even if the contracts still exist, Cook Inc. and Cook Medical are not parties to the contracts, as Cook Inc. assigned the contracts to non-party CMT in 2010. Cook points to no evidence that Amplatz ever consented to this assignment, however. As a result, Cook Inc. remains responsible for performing its duties under the contracts, whether or not it assigned the contracts to CMT. *See Epland v. Meade Ins. Agency Assocs., Inc.*, 564 N.W.2d 203, 207 (Minn. 1997) ("A party may not divest itself of liability on a contract without the consent of the other party to the contract."); *Vetter v. Sec. Cont'l Ins. Co.*, 567 N.W.2d 516, 521 (Minn. 1997) ("the original obligor may not divest itself of liability without the consent of the obligee"); *Tony & Leo, Inc. v. U.S. Fid. & Guar. Co.*, 281 N.W.2d 862, 865 (Minn. 1979) ("A mere assignment does not absolve the assignor of its obligations under a contract.").

In addition, CMT licenses the contracts back to Cook Inc. to practice. Whetham Dep. 230, 242, 249 [ECF No. 206-1]. As a result, even if Cook Inc. was somehow divested of its contractual duties by virtue of the 2010 assignments, Cook Inc. would nevertheless be liable on the contracts as a result of this license. *S O Designs USA, Inc. v. Rollerblade, Inc.*, 620 N.W.2d 48, 54 (Minn. Ct. App. 2000) (explaining that a license is

simply a form of assignment and that, as a result, either the assignee or, upon the assignee's failure, the assignor, were liable to pay royalties).

Similarly, a jury could find that either Cook Inc. or CMT impliedly granted Cook Medical a license. Indeed, if the jury finds that the royalty contracts still exist, the jury will almost certainly also find that Cook Medical has a license to practice rights under those contracts, and almost certainly find that Cook Medical is obligated to pay royalties. *Id.* Alternatively, the jury could find that, through its conduct marketing Amplatz-branded products and paying royalties to Amplatz, Cook Medical entered into (or took over) a contract or contracts with Amplatz, the terms and duration of which would be fact questions for the jury.

Cook next argues that the contracts fail for lack of consideration. Specifically, Cook argues that it received nothing of value in return for its royalty payments because the Amplatz name had become a generic or descriptive term, and therefore lacked economic value. But whether the Amplatz name had become generic or descriptive—and, if so, whether Cook nevertheless received something of value in return for its royalty payments—are jury issues, and Cook is therefore not entitled to summary judgment on this ground. *Cf. Ford Motor Co. v. Summit Motor Prods., Inc.*, 930 F.2d 277, 292 n.18 (3d Cir. 1991) ("The characterization of a mark is a factual issue for the jury.").

-9-

Cook next contends that the alleged contract or contracts are unenforceable under the statute of frauds. *See* Minn. Stat. § 513.01(1) (to be enforceable, a contract that "by its terms is not to be performed within one year from the making thereof" must be in writing). Obviously, whether either alleged contract must be in writing depends on its terms, and those terms are disputed.

Cook argues that, if the Estate is correct that royalties are contractually payable to Amplatz's heirs, the contracts are necessarily incapable of being performed within a year and therefore must be in writing. This argument is misplaced, however, as the statute of frauds does not apply to a contract unless the contract *by its terms* cannot possibly be performed within one year. *Id.* It does not matter whether performance within a year is likely. *See Eklund v. Vincent Brass & Aluminum Co.*, 351 N.W.2d 371, 375 (Minn. Ct. App. 1984) ("The test is simply whether the contract by its terms is capable of full performance within a year, not whether such occurrence is likely." (citation omitted)). Accordingly, when the length of a contract is measured by a lifetime (or lifetimes), the contract is capable of performance within a year (because the relevant life could end at any moment), and the statute of frauds therefore does not apply. *See id.* at 375–76 (holding that a contract for permanent employment until retirement was capable of performance within a year because, among other things, the employee could

have died within the year). Cook is not entitled to summary judgment on the basis of the statute of frauds.

Finally, the Court denies Cook's motion for summary judgment as to the Estate's alternative claims for unjust enrichment and breach of the duty of good faith and fair dealing. Cook argues that the Estate's unjust-enrichment claim fails because the Amplatz name had become generic or descriptive and therefore had no economic value. Again, though, this is a disputed issue of fact. Cook also argues that the unjust-enrichment claim fails because an "adequate legal remedy" exists and contends that this is true "even when a plaintiff's legal claims lack merit," citing *Loftness Specialized Farm Equipment, Inc. v. Twiestmeyer*, 742 F.3d 845, 854 (8th Cir. 2014). *See* ECF No. 296 at 27. In *Loftness*, however, the unjust-enrichment claim failed because the parties' relationship was governed by contracts. *Id.* at 854–55 ("Having struck this deal, Twiestmeyer, Hood, and T & A cannot rewrite it via unjust enrichment."). Here, however, the existence of a contract is in dispute, and the Estate can therefore pursue its claim of unjust enrichment in the alternative.

As for the duty of good faith and fair dealing, Cook's only argument is that, because the parties have no enforceable contract, there can be no implied contractual duty of good faith. Again, however, the existence of a contract between the parties is a disputed factual issue.

2.  Right of Publicity

Cook also moves for summary judgment on the Estate's claim for violation of Amplatz's right of publicity.  *See Ventura v. Titan Sports, Inc.*, 65 F.3d 725, 730 (8th Cir. 1995) ("We believe that the Minnesota Supreme Court would recognize the tort of violation of publicity rights."); *Paisley Park Enters., Inc. v. Boxill*, 299 F. Supp. 3d 1074, 1084 (D. Minn. 2017) ("The right of publicity under Minnesota common law is descendible and enforceable by the decedent's estate.").

*a.  Abandonment*

Cook first argues that Amplatz had no protectable right of publicity because he waived or abandoned his right to control the use of his name for commercial purposes. Cook points to evidence that, in 1999, Boston Scientific notified Amplatz that it would no longer pay him royalties, but would nevertheless continue to use his name to sell products.  Defs.' Ex. 4.  Cook also cites other examples of companies who apparently use the Amplatz name for commercial purposes without paying royalties.  Cook compares the right of publicity to a trademark, which an owner can abandon through acts of omission (as well as commission) that cause the mark to lose its significance as a mark.  *See* Minn. Stat. § 333.18, subd. 6(2).

The right of publicity certainly bears some similarity to trademark law, but the Court does not agree that the concept of abandonment should apply in this context.

-12-

"One's birth name is an integral part of one's identity; it is not bestowed for commercial purposes, nor is it 'kept alive' through commercial use." *Abdul-Jabbar v. Gen. Motors Corp.*, 85 F.3d 407, 411 (9th Cir. 1996); *cf. Price v. Hal Roach Studios, Inc.*, 400 F. Supp. 836, 846 (S.D.N.Y. 1975) (characterizing as "nonsensical" the argument that, through non-use, a person could lose rights in his own name and likeness), *abrogated on other grounds by Pirone v. MacMillan, Inc.*, 894 F.2d 579, 585–86 (2d Cir. 1990) (recognizing that New York courts have held that the only right of publicity under New York law is statutory). Consequently, "[a] proper name . . . cannot be deemed 'abandoned' throughout its possessor's life, despite his failure to use it, or continue to use it, commercially." *Abdul-Jabbar*, 85 F.3d at 411.

The Court agrees with this analysis and finds it equally applicable to Cook's argument that Amplatz waived or abandoned his right to control the commercial use of his name by failing to enforce that right against Boston Scientific and other companies. The Court holds that, under Minnesota law, an individual's right to control the commercial use of his or her name cannot be abandoned or waived by omission—that is, by a failure to enforce—at least during that individual's lifetime.

### b.  Generic or Descriptive Term

Cook next argues that, by 2019, the name "Amplatz" had become a generic or descriptive term to which Amplatz no longer had an exclusive right.  *Cf.* 2 McCarthy on

-13-

Trademarks and Unfair Competition § 13:24 (5th ed.) ("A personal name, even though originally used as a valid mark, may, through public usage, become a generic designation for a genus of goods. As such, a generic personal name designation is in the public domain and free for all to use.").

Whether this defense should apply to a right-of-publicity claim is a difficult legal question. Rather than resolving that question now, the Court will wait until a jury decides the factual issue of whether "Amplatz" has, in fact, become generic or descriptive. *Cf. Ford Motor Co.*, 930 F.2d at 292 n.18 ("The characterization of a mark is a factual issue for the jury."). If Cook succeeds in persuading the jury that "Amplatz" has become generic or descriptive, *cf. Murphy Door Bed Co. v. Interior Sleep Sys., Inc.*, 874 F.2d 95, 101 (2d Cir. 1989) (placing the burden of proof on the defendant to show that the public expropriated a name and rendered it generic), then the Court will decide whether "genericization" is a valid defense to a right-of-publicity claim. Cook's motion for summary judgment is therefore denied as to the Estate's right-of-publicity claim.

### 3. Punitive Damages

Finally, Cook moves for summary judgment on the Estate's claim for punitive damages. Factual issues preclude summary judgment on this claim, however, and Cook's motion is therefore denied.

*C. Cook's Claims*

As noted, Cook brings counterclaims for unjust enrichment and breach of contract. The Estate moves for summary judgment on both claims, and Cook seeks summary judgment in its favor on its unjust-enrichment claim.

1. Statute of Limitations

The Court agrees with the Estate that both of Cook's counterclaims are barred by Minn. Stat. § 524.3-803(a), which imposes a limitations period for claims against an estate. Specifically, § 524.3-803(a) provides that a claim against a decedent's estate that arose before the decedent's death is time-barred unless presented as follows:

> (1) in the case of a creditor who is only entitled, under the United States Constitution and under the Minnesota Constitution, to notice by publication under section 524.3-801, within four months after the date of the court administrator's notice to creditors which is subsequently published pursuant to section 524.3-801;

> (2) in the case of a creditor who was served with notice under section 524.3-801(c), within the later to expire of four months after the date of the first publication of notice to creditors or one month after the service;

> (3) within one year after the decedent's death, whether or not notice to creditors has been published or served under section 524.3-801. Claims authorized by section 246.53, 256B.15, or 256D.16 must not be barred after one year as provided in this clause.

*Id.*

The parties appear to agree that subsection (a)(3) is the relevant provision in this case. As Cook first brought a counterclaim on December 6, 2021, and as that was more than two years after Amplatz's death, Cook's counterclaims are barred under the statute.[6] *See* ECF No. 6.

Cook makes a number of arguments to the contrary, all of them unavailing:

### a. Jurisdiction

Citing *Marshall v. Marshall*, 547 U.S. 293 (2006), Cook first argues that the "probate exception" to federal-court jurisdiction bars this Court from applying Minn. Stat. § 524.3-803. According to Cook, the Court is required to adjudicate the merits of its unjust-enrichment claim without regard to the applicability of § 524.3-803. If Cook prevails, says Cook, it can then present its claim to the probate court, at which point the Estate can raise its statute-of-limitations defense to that claim.

This procedure would make no sense, and, not surprisingly, nothing in *Marshall* requires it. To the contrary, *Marshall* emphasized that the probate exception is quite narrow and only precludes federal courts from (1) probating or annulling a will, (2) administering a decedent's estate, and (3) interfering with a probate court's exercise of *in rem* jurisdiction over a *res*. *Marshall*, 547 U.S. at 311–12 ("Thus, the probate

---

[6]Notably, Cook initially counterclaimed only for unjust enrichment. *See* ECF No. 6. Cook did not bring its breach-of-contract claim until April 2023, about three-and-a-half years after Amplatz's death.

exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court."); *Kiddie v. Copeland*, 741 F. App'x 355, 356 (8th Cir. 2018) (per curiam) ("The probate exception only applies to three types of cases: the probate or annulment of a will, the administration of a decedent's estate, and the exercise of *in rem* jurisdiction over property already asserted within the *in res* jurisdiction of a state court.").

Consequently, "if the plaintiff seeks an *in personam* judgment against the defendant and not a *res* in the custody of a state court, the federal district court may properly adjudicate the claim." *McAninch v. Wintermute*, 491 F.3d 759, 766 (8th Cir. 2007) (cleaned up); *see also Kiddie*, 741 F. App'x at 356 ("Seeking an in personam judgment against a person for their conduct with property that ultimately became estate property is not within the probate exception to federal jurisdiction.").  That is exactly the situation here with respect to Cook's claims against the Estate.

This Court has subject-matter jurisdiction over Cook's claims.  It would be exceedingly strange if this Court could exercise that subject-matter jurisdiction to resolve everything about Cook's claims—substantively and procedurally—except the question of whether the claims are timely under state law.  The application of § 524.3-803 does not implicate any of the exceptions to federal jurisdiction, and Cook cites to no case holding

-17-

that a federal court can adjudicate everything about a claim against an estate except the application of the statute of limitations. The Court therefore rejects Cook's argument that the Court lacks jurisdiction to apply § 524.3-803.

*b. Peterson*

Cook next argues that, under *Peterson v. Marston*, 362 N.W.2d 309 (Minn. 1985), its communications with the Estate's attorneys in February and March 2020 qualify as presentation of a timely claim against the Estate. The Court disagrees.

*Peterson* addressed what is necessary to "present" a claim against an estate within the meaning of Minn. Stat. § 524.3-804 ("Manner of presentation of claims"). Section 524.3-804 authorizes two types of presentment: (1) delivering to the personal representative or filing with the court administrator "a written statement of the claim indicating its basis, the name and address of the claimant, and the amount claimed," or (2) commencing "a proceeding against the personal representative in any court where the personal representative may be subjected to jurisdiction . . . within the time limited for presenting the claim."

In *Peterson*, the Minnesota Supreme Court held that a letter inquiring about the status of a contract for deed sent to an attorney for an estate qualified as a written statement of a claim under § 524.3-804. *Peterson*, 362 N.W.2d at 313. The court focused on whether the letter communicated a present intent to make a claim. *Id.* at 312

(discussing whether the language of the letter showed a "present intent to make a claim"). The court held that the letter communicated such an intent, as (1) the letter was sent in response to a published notice about how to make claims against the estate; (2) the letter was sent to the estate attorney identified in the published notice; (3) the claimants mentioned the contract for deed and stated that they understood that they needed to present their claim against the estate within four months; and (4) the claimants asked if their contract would be affected and whether "any action is necessary." *Id.* at 312–13.

In contrast to *Peterson*, Cook's February and March 2020 correspondence with the estate attorneys does not demonstrate a present intent to make a claim. To the contrary, the final email from Cook to the Estate's attorneys states that "Cook is currently weighing its options with respect to these [royalty] payments, none of which should have ever been made." Defs.' Ex. 30 (March 16, 2020 email). A statement that a party is "weighing its options" is not a demand or assertion of a right to payment. *Peterson*, 362 N.W.2d at 312 ("A claim is a demand, an assertion of the right to payment.").

The very different context of the correspondence in *Peterson* underscores the Court's conclusion. *Peterson* involved an undisputed contract under which the claimants obviously expected—and were contractually entitled to—ongoing payments. Here, by contrast, in the months after Amplatz's death, what eventually became the parties'

-19-

dispute over the nature of the Amplatz/Cook relationship and the basis for the many years of royalty payments that Cook had made to Amplatz was just beginning to take shape. In light of that context, Cook's correspondence is plainly not "evidence of present intent to make a claim." *Id.*

There are a couple of additional reasons why Cook's correspondence fails to satisfy Minn. Stat. § 524.3-804—which, again, requires "a written statement of the claim indicating its basis, the name and address of the claimant, and the amount claimed." Cook has been careful, throughout these proceedings, to insist that the separate corporate identities of the various Cook entities be scrupulously respected.[7] In the correspondence on which it relies, however, Cook's attorneys repeatedly refer to the Cook entities as a group. *See* Defts.' Exs. 28–30. Consequently, the "name . . . of the claimant" is not clear from this correspondence.

The "amount claimed" is even less clear. *Peterson* involved a contract for deed requiring the decedent to make payments in specific amounts on specific dates. *Peterson*, 362 N.W.2d at 313. The estate attorney was familiar with the contract, as his firm had drafted it, he had notarized it, and he was generally aware of its contents. *Id.* ("Because of his familiarity with the contract, specific mention of the amount due was not necessary; [the estate attorney's] familiarity with and access to the contract constituted

---

[7]"Cook" is merely the shorthand that the Court has used to refer to the two remaining defendants in order to improve the readability of this order.

notice of the amount claimed.").  Here, by contrast, the parties' correspondence demonstrates that the estate attorneys were unfamiliar with the nature of the Amplatz/Cook contractual relationship.  Indeed, most of the exchange between the estate attorneys and Cook's attorneys involved the estate attorneys trying to get the information they needed to figure out the nature of the Amplatz/Cook relationship. Obviously, then, those attorneys would have no idea how to calculate the amount of any claim that Cook might assert.

True, Cook's emails mention certain dollar amounts.  *See* Defts.' Ex. 30 (March 16, 2020, email mentioning that "in the period 2006–2018 <u>alone</u> Cook paid more than $5.5 million to Dr. Amplatz . . . even though Cook had no legal or contractual obligation to do so").  But nowhere does Cook identify the amount of any claim against the estate.  To the contrary, the emails make clear that the dollar amounts they mention are *not* the total value of any claim that one or more of the Cook companies might assert against the Estate.  *See* ECF No. 291 at 30 ¶ 18 (unjust-enrichment claim for payments Cook made to Amplatz "[f]rom 2000 to at least August 2019"); *id.* at 31–32 ¶ 29 (breach-of-contract claim for payments made "for at least the years 2015–2018").

For all of these reasons, Cook's February and March 2020 correspondence does not constitute a "claim" for purposes of § 524.3-804 and *Peterson*.

### c. *Minn. Stat. § 524.3-803(c)(4)(ii)*

Cook next contends that the Court should allow its claim under Minn. Stat.

§ 524.3-803(c)(4)(ii).  That provision authorizes a court to permit a late claim "for cause

shown."  To establish cause, a claimant must establish a "significant reason" for the

delay.  *In re Est. of Kotowski*, 704 N.W.2d 522, 531 (Minn. Ct. App. 2005).  "A petition for a

late claim may be granted in cases of 'hardship, misunderstanding, and diligent but

mistaken procedures' but not in cases of 'unexplained and inexcusable lack of

diligence.'"  *Id.* (quoting *In re Est. of Thompson*, 484 N.W.2d 258, 261–62 (Minn. Ct. App.

1992)).

Cook argues that it has established cause because it did not receive notice under

Minn. Stat. § 524.3-801.  As Cook acknowledges, however, the one-year statute of

limitations applies regardless of whether the creditor received notice.  *See* Minn. Stat.

§ 524.3-803(a)(3) (claims must be brought "within one year after the decedent's death,

whether or not notice to creditors has been published or served under section

524.3-801").  More importantly, Cook learned of Amplatz's death within just a few

weeks after it occurred.  Whetham Dep. 111–12 [ECF No. 206].  Yet Cook did not assert a

claim against Amplatz's estate until December 6, 2021, more than *two years* later.  ECF

No. 6.  As Cook failed to act diligently, the Court will not excuse its late presentation.

In sum, the Court grants the Estate's motion for summary judgment on Cook's counterclaims for unjust enrichment and breach of contract because those claims are barred by the statute of limitations.

2.  Recoupment

Finally, Cook argues that, even if its unjust-enrichment claim is time-barred, that claim may nevertheless serve as a recoupment defense.  *See Household Fin. Corp. v. Pugh*, 288 N.W.2d 701, 703 (Minn. 1980) ("a defense in the nature of recoupment is generally permitted even though the applicable statute of limitations would have barred an independent action on the same claim").  A claim for recoupment "must arise out of the same transaction that is the subject matter of the plaintiff's action and it can only be utilized to reduce or avoid the plaintiff's recovery."  *Id.* at 704.

The Court does not understand how the Estate could recover on any of its claims against Cook and yet also be found liable to Cook for unjust enrichment.  If the Estate recovers on it contract claims, Cook would be precluded from recouping anything on an unjust-enrichment theory.  *See Graff v. Brighthouse Life Ins. Co.*, 109 F.4th 1118, 1124 (8th Cir. 2024) ("Under Minnesota law, equitable remedies, including recovery under a theory of unjust enrichment, 'cannot be granted where the rights of the parties are governed by a valid contract.'" (quoting *Loftness*, 742 F.3d at 854)).  If the Estate recovers on its own unjust-enrichment claim, it is hard to imagine how Amplatz could also have

-23-

been unjustly enriched by Cook so as to reduce the Estate's recovery. And finally, if the Estate recovers on its right-of-publicity claim, then Cook never had the right to use the Amplatz name for free, and the requirement that it pay Amplatz for using his name would not be "unjust."

Setting this aside, Cook's unjust-enrichment claim fails on the merits. "Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012), *superseded by statute on other grounds as stated in Hall v. City of Plainview*, 954 N.W.2d 254, 270 (Minn. 2021). "[U]njust enrichment claims do not lie simply because one party benefits from the efforts or obligations of others . . . ." *First Nat'l Bank of St. Paul v. Ramier*, 311 N.W.2d 502, 504 (Minn. 1981). "[T]he plaintiff must show that the defendant was enriched illegally or unlawfully, or in a manner that is morally wrong." *Herlache v. Rucks*, 990 N.W.2d 443, 450 (Minn. 2023) (cleaned up). "[U]njust enrichment should not be invoked merely because a party has made a bad bargain." *Cady v. Bush*, 166 N.W.2d 358, 362 (Minn. 1969).

Applying these principles, no reasonable factfinder could conclude that Amplatz was *unjustly* enriched by the royalty payments he received from Cook. The undisputed evidence establishes that, despite the expiration terms in the written contracts to which it

now points, Cook knowingly and deliberately chose to continue making royalty payments to Amplatz, including for new products that Cook knew were not covered by the written contracts. Cook (1) paid royalties on a regular basis for nearly 20 years *after* it now claims that it no longer was contractually obligated to do so; (2) characterized the royalty payments as being pursuant to a contract in its communications with Amplatz; and (3) put each royalty payment through layers of review, including by a manager and a corporate officer. Richardson Dep. 32, 36–42, 89–90 [ECF No. 277].

Even when a Cook employee raised questions about the royalty payments, Cook insisted on continuing to make them. Ryan Dep. 29–30, 45–48, 78, 155 [ECF No. 206-3] (employee was told to "leave it alone" and later remarked to an employee in the accounting department that the payments were "untouchable until death"). And when an issue arose regarding payments to Frank Kotula, a colleague of Amplatz with whom Amplatz split his Cook royalties, Cook (through its general counsel) took the position that Kotula was entitled to payments *through the end of his life*. ECF No. 315-9; ECF No. 277-2 at 5. Cook has no coherent explanation for why Kotula, but not Amplatz, would be entitled to payments until the end of his life.

All of this evidence establishes beyond any doubt that Cook make a deliberate decision to continue to make the royalty payments until 2019. There is, however, no competent evidence as to *why* Cook decided to do so. Cook contends that it was paying

royalties, not because it was contractually bound, but because it made a "business

decision" to do so in the belief that there was economic value in Amplatz's name.  But

when the Court pressed Cook on this assertion, Cook was unable to cite any evidence

concerning who made the "business decision" to continue paying royalties, much less

why that "business decision" was made.[8]  ECF No. 340 at 44–54; Ryan Dep. 15–16, 31

[ECF No. 315] (Cook cannot identify who made the alleged business decision); Whetham

Dep. 85 [ECF No. 298-4] (Cook does not know who made the decision).  Instead, Cook

just kept repeating the mantra that at some (unidentified) point some (unidentified)

person made a "business decision" for some (unidentified) reason to continue to pay

royalties to Amplatz.

---

[8]Cook contends that a written Cook policy dating from the 1980s demonstrates that Cook would pay royalties for the use of a physician's name even in the absence of a contract.  *See* ECF No. 321 at 7; Defts.' Ex. 21 ¶ 7.

There are two problems with Cook's argument.  First, the policy says no such thing.  The policy is entitled "Policy on Royalty Agreements" and is clearly discussing contractual relationships; the final paragraph, to which Cook points, begins by stating that "[i]f COOK INCORPORATED and the inventor-developer arrive at an agreement . . . ."  Defts.' Ex. 21 ¶ 7.  Nowhere does the policy mention making payments in the absence of a contract.  Second, because there is no evidence concerning who made the alleged business decision, there is also no evidence that he or she knew of or was following this policy, or even that the policy was in effect at the unknown time that the decision was made.  (Notably, the cover letter accompanying the policy stated that "[t]his policy [is] certainly not to be considered the only way that we could come to an agreement with a developer . . . ."  Defts.' Ex. 21.)

This will not do.  Corporate employees typically do not make a "business decision" to pay for nothing.  Without any evidence as to *why* Cook made the "business decision" to continue to pay royalties, Cook cannot show that anything unjust occurred.  Indeed, the sparse evidence in the record suggests that Cook decided to continue the royalty payments on account of its long and close relationship with Amplatz and because it was continuing to benefit from that relationship.  Ryan Dep. 15 [ECF No. 315] (testifying that Cook continued paying royalties both because of the belief that the Amplatz name was valuable and because of the parties' relationship); Whetham Dep. 108 [ECF No. 206] (discussing email referring to Amplatz's lengthy relationship with the "Cook family").

Cook complains that Amplatz never informed it that other medical-device companies were using Amplatz's name without compensating him.  Again, because there is no evidence as to why Cook continued paying royalties, there is also no evidence that such information would have made any difference to Cook.[9]  Setting that aside,

_____

[9]Cook points out that the 1995 contract granted Cook "the exclusive right to use [Amplatz's] name in the descriptive title of the stated product," as well as the exclusive right to manufacture that product.  ECF No. 313 at 4.  The "stated product" in the 1995 contract was discontinued in 2002, however, and Cook does not point to anything that would give rise to an implied exclusivity provision as to *other* products.  *Id.*; Ryan Dep. 67–69 [ECF No. 315].  Indeed, any such implication is severely undermined by the fact that the parties clearly knew how to agree on exclusivity, yet chose not to do so in the 1983 contract, which covered more products than the 1995 contract.

(continued...)

nothing in the parties' written contracts required Amplatz to prevent other medical-device companies from using his name or to inform Cook how much (if anything) he was being paid by other companies who used his name. Nor has Cook pointed to anything in the parties' subsequent course of dealing that would have given Amplatz any idea that Cook expected him to provide such information.

Indeed, under Cook's version of events, Cook had no contractual or other legal obligation to pay royalties, but nevertheless made a "business decision" to continue to pay money that it was not obligated to pay. Again, its argument that it would have made a different "business decision" if it had learned that other companies were (legally or illegally) using the Amplatz name without paying for a license falters on the fact that there is no evidence explaining why Cook continued to make payments. Setting that aside, if Cook's account is accurate, then Cook believed that it had no legal obligation to pay Amplatz but decided to do so anyway. Ryan Dep. 22 [ECF No. 315]. If Cook

---

[9](...continued)
    Moreover, the 1995 contract did not impose a duty on Amplatz to police others' use of his name, which is something that Cook could have done as easily as Amplatz. *See* Restatement (Third) of Unfair Competition § 46 (1995) ("[W]hen the license is exclusive, courts have held that the licensee has standing to object to commercial uses that infringe on the scope of the licensee's exclusive right"); *Hillerich & Bradsby Co. v. Christian Bros.*, 943 F. Supp. 1136, 1138 (D. Minn. 1996) (granting exclusive licensee's motion for a preliminary injunction against competitor's use of player's name on sports equipment). The Court thus sees little basis for implying an exclusivity provision in the parties' relationship, and particularly not such a provision that imposes duties on Amplatz that were not imposed under the written terms of the 1983 and 1995 contracts.

believed that it had no legal obligation to pay Amplatz, Cook can hardly complain that other companies reached the same conclusion, or that Amplatz did not attempt to prevent other companies from using his name.  In short, even under Cook's version of events, there is nothing unjust about Amplatz retaining the royalty payments.

For these reasons, the Court grants the Estate's motion for summary judgment on Cook's recoupment defense.[10]

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' motion for summary judgment [ECF No. 294] is GRANTED IN PART and DENIED IN PART.

    a. The motion is GRANTED as to plaintiff's claims of promissory estoppel and unfair competition.

    b. The motion is DENIED in all other respects.

2. Plaintiff's motion for partial summary judgment [ECF No. 308] is GRANTED IN PART and DENIED IN PART.

    a. The motion is GRANTED as to:

---

[10]Cook does not contend that its counterclaim for breach of contract would entitle it to recoupment.  *See* ECF No. 321 at 19.  The Court therefore grants summary judgment as to the entirety of Cook's recoupment defense.

       i.      Defendants' counterclaims for unjust enrichment and breach of contract.

      ii.     Defendants' waiver and abandonment defenses to plaintiff's right-of-publicity claim.

     iii.    Defendants' recoupment defense.

b.    The motion is DENIED in all other respects.

Dated:  December 27, 2024

_____

Patrick J. Schiltz, Chief Judge
United States District Court

-30-